ANNA E. MUNSON, Respondent, *v.* THE GENESEE IRON AND BRASS WORKS, Defendant, Impleaded with THE FLOUR CITY NATIONAL BANK and Others, Appellants.

*Mortgages to secure just debts given by a corporation in contemplation of insolvency —*
*they may be attacked by one who has recovered judgment against the corporation for*
*a tort — the statutory prohibition is not confined to a corporation which has*
*"refused to pay any of its notes."*

The provision of section 48 of the Stock Corporation Law (Chap. 564, Laws of 1890), to the effect that no officer, director or stockholder of a corporation shall make any transfer or assignment of its property to any person in contemplation of its insolvency, applies to such a transfer or assignment made by the corporation itself.

Mortgages executed by the corporation in violation of such section may be attacked by a person who, after such mortgages were recorded, but, on the same day, obtains judgment in an action brought against the corporation to recover damages for personal injuries.

The fact that such mortgages were given to secure just obligations of the corporation, and were not fraudulent as against creditors, is immaterial where it appears that the mortgagees knew that they were executed in contemplation of its insolvency.

The word "thereof," used in the 2d clause of section 48 of the Stock Corporation Law, does not relate solely to a corporation which has "refused to pay any of its notes or other obligations when due, in lawful money of the United States," referred to in the 1st clause of that section.

APPEAL by the defendants, The Flour City National Bank and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Monroe on the 18th day of April, 1898, upon the report of a referee.

This is an action in equity to set aside and declare void certain mortgages and contracts by the Genesee Iron and Brass Works, a corporation, to the other defendants, covering all its real and personal property, as fraudulent and void, upon the grounds: *First,* that the same were executed by the corporation with intent to hinder, delay and defraud its creditors, and, *second,* that the same were given by the corporation in contemplation of its insolvency.

No defense was interposed by the corporation. The other defendants defended, insisting upon the validity of their mortgages. The case was referred for trial and determination to Elbridge L. Adams, referee, who rendered a decision in favor of the plaintiff and against

the defendants, adjudging the mortgages null and void and appointing a receiver of the property of the corporation. The action was predicated upon a judgment that had been recovered against the corporation of $3,309.62 by the plaintiff for personal injuries sustained by her on the 16th day of February, 1889. She commenced an action to recover damages for such injury. The corporation answered, and the case was set down for trial at the Monroe Circuit on the 17th day of March, 1892. Prior to the nineteenth day of March the case went on the Circuit day calendar. The trial was commenced on the twenty-second of March and continued on the twenty-third, and was given to the jury in the afternoon of that day, and the jury was instructed by the court to bring in a sealed verdict, which they did on the morning of March 24, 1892, on the opening of the court at nine o'clock and thirty minutes in the morning for damages against the defendant corporation for $3,150. Judgment was perfected on that verdict at eleven o'clock and ten minutes of that morning. At nine-twenty o'clock of the same morning there were recorded in the Monroe county clerk's office mortgages on the corporation's real estate to all the appellants in this action, and at the same time there were filed chattel mortgages executed to the appellants covering all the personal property of the corporation except to the defendant Stull, who only had a real estate mortgage. These mortgages were dated March 19, 1892, and were executed in pursuance of an arrangement between these appellants and the corporation and its officers, with a view to give a preference to the appellants over other creditors of the corporation and with full knowledge on the part of the corporation officers and of the appellants that the corporation at that time was insolvent and unable to pay its debts. The debts of the appellants which these mortgages were given to secure were just obligations against the corporation. An execution was issued upon the plaintiff's judgment and returned wholly unsatisfied before the commencement of this action. The corporation was wholly insolvent at the time of the execution of appellants' mortgage. It was organized on September 20, 1888, for the manufacture and sale of water closets. It had no property when it commenced business except an interest in patents, the value of which does not appear. Before giving the mortgage to the appellants, it had executed a mortgage

on its real estate to the Mutual Life Insurance Company of New York for $9,000, which was all that the mortgaged property was worth. Soon after the chattel mortgages were filed the appellants, except Mr. Stull, took possession of the personal property under their chattel mortgages and advertised the mortgaged property for sale for the 2d of April, 1892, when the property was sold, and by an arrangement between themselves all of the appellants, including Mr. Stull, shared in the proceeds of the sale and took such proceeds, amounting to $3,900. A receiver of the corporation was appointed on April 14, 1892, in this action, but the proceeds of the sale have not come into his hands, and the judgment directs a recovery by the plaintiff in this action of the sums of money received by the defendants other than the Genesee Iron and Brass Works respectively. The defendants contesting duly excepted to the conclusions of law of the referee and have appealed to this court.

*Joseph S. Hunn,* for the Flour City National Bank, appellant.

*Heman W. Morris,* for Sullivan & Morris, appellants.

*Joseph A. Stull,* in his own behalf, appellant.

*John H. Hopkins,* for the Commercial Bank, appellant.

*Charles F. Miller,* for the respondent.

WARD, J. :

The learned counsel for the appellants present the question upon this review whether the plaintiff acquired such an interest by her judgment in the tort action, which was rendered after the execution of the chattel mortgages, as will entitle her to participate in the fund that resulted from the sale of the mortgaged property, and which the judgment in this action directs should be recovered from the defendants. It is contended that she was not a creditor of the Genesee Iron and Brass Works at the time of the execution and delivery of the mortgages, and consequently has no standing whereby she can participate in the fund.

This case must be governed by section 48 of the Stock Corporation Law (Chap. 564, Laws of 1890), which is as follows: " No corporation which shall have refused to pay any of its notes, or other obligations when due, in lawful money of the United States,

nor any of its officers or directors, shall assign any of its property to any of its officers, directors or stockholders, directly or indirectly, for the payment of any debt; and no officer, director or stockholder thereof shall make any transfer or assignment of its property, or of any stock therein, *to any person in contemplation of its insolvency.* And every such transfer or assignment to such officer, director *or other person, or in* trust for them or their benefit, shall be void."

The condemnation of this statute, which reaches this case, consists in a corporation making " any transfer or assignment of its property, or of any stock therein, to any person in contemplation of its insolvency." The statute is silent as to who can attack this transfer. It is fundamental that the plaintiff must have some right or interest in the property which he seeks to recover in an action. He may be a contract creditor, and if his claim is founded on a tort and its amount was undetermined at the time of the transfer, he is in a position, after having obtained judgment for the damages resulting from the tort, to attack the transfer and share in the property of the corporation. (*Kain* v. *Larkin,* 4 App. Div. 209, 210, and cases there cited ; *Olney et al.* v. *The Conanicut Land Co.,* 16 R. I. 597.)

In the last case cited A. brought an action against the corporation for injuries resulting from the negligence of the corporation. Pending the action, the corporation, then insolvent, mortgaged its property to its directors for moneys advanced. A., after having recovered judgment, levied on the corporate property and filed a bill in equity to set aside the mortgage. Held, that A. was entitled to have the mortgage declared void as against him. Speaking of the company's liability for tort the court says : " We fail to see that it was any less the duty of the directors to protect these liabilities of the company than those arising upon contracts."

In *Marstaller* v. *Mills* (143 N. Y. 398) it was held that a cause of action against a domestic business corporation created by its negligence could be maintained against the trustees holding corporate property for the purpose of distribution, and that the word " creditors " includes all those to whom the corporation was under any enforcible obligation at the time of its dissolution as well as those to whom it was indebted.

It follows, therefore, that assuming that the statute cited is to be

construed only as applying to creditors of the corporation, the plaintiff comes within that description.

The learned counsel for the appellants cite *Esmond* v. *Bullard* (16 Hun, 65); *Crouch* v. *Gridley* (6 Hill, 250), and *Campbell* v. *Perkins* (8 N. Y. 438) and kindred cases as sustaining their contention. These cases arose under bankruptcy acts or other statutes which expressly relate to the proving or payment of *debts*. And the courts held that a claim in tort was not, strictly speaking, a debt within the purview of those statutes. The *Esmond* case was affirmed in the Court of Appeals (*sub nom. Losee* v. *Bullard,* 79 N. Y. 404), but upon other grounds, that court declining to decide this question.

The assets of a corporation are a trust fund for the payment of its debts and obligations upon which its creditors have an equitable lien both as against the stockholders and all transferees except those purchasing in good faith and for value. (*Cole* v. *M. I. Co.,* 133 N. Y. 164.)

This case answers the contention of the banks and of Mr. Stull that they should be permitted to hold the funds received by them because their claims were founded upon contracts entered into before the transfers or mortgages were executed and were just and equitable. They were not mortgagees in good faith; that is, they knew that the corporation was insolvent and that it was making the transfer of its property to them in contemplation of its insolvency. (*Salt* v. *Ensign,* 79 Hun, 107; *Jefferson County National Bank* v. *Townley,* 92 id. 172; *Cole* v. *M. I. Co., supra.*)

But it is said that the statute does not apply unless the transfer is fraudulent as to creditors, which the referee has not found and the proofs do not disclose; that the creditors were simply seeking to recover just debts which they were entitled to do as vigilant creditors. This contention is answered in *Kingsley* v. *First National Bank of Bath* (31 Hun, 335), where Judge BARKER says: "The statute declares the assignment or transfer void in case the same is made in contemplation of insolvency. The question to be determined is not one of fraud, or of an intent on the part of the creditor to obtain a preference in the payment of his debt; but the simple inquiry is was there actual or contemplative insolvency and a transfer of property for the benefit of creditors. If both these facts are established then the transaction is void." (Citing many cases.)

And Judge FINCH says in *Cole* v. *M. I. Co.* (*supra*, at p. 168) : " The transfer was illegal also because made in contemplation of insolvency. Those who accomplished it knew that its necessary and inevitable effect would be to make the corporation unable to pay its debts and must be held to have intended that consequence of their acts. I do not agree to that reading of the statute which limits its prohibition to cases in which payment of some note or obligation has been previously refused. An interpretation so narrow would seriously maim and distort the obvious purpose of the statute and make a transfer in contemplation of insolvency good the day before a note matured and bad the day after."

It is further claimed that the statute itself does not apply ; that it only relates to a transfer made by an officer, director or stockholder of the corporation and not the corporation itself. This view is too narrow (as Judge FINCH said in construing another part of this same section) and is not warranted by the purposes of the statute or the evils it sought to remedy. A transfer of corporate property is never made strictly by that intangible thing, the corporation, but must of necessity be made by its officers and its agents, executed under the forms of law as was done in this case. (*Troy Waste Manufacturing Co.* v. *Harrison*, 73 Hun, 528 ; *Harris* v. *Thompson*, 15 Barb. 64.)

An exhaustive and learned opinion by the referee reviewing the facts and the law in this case has afforded us great assistance in reaching our conclusion, and we concur in that opinion.

The judgment appealed from should be affirmed, with costs.

All concurred.

The following is the opinion of the referee :

ELBRIDGE L. ADAMS, Referee :

This action was brought to have certain mortgages given by the Genesee Iron and Brass Works to the other defendants, upon its real and personal property, declared void as against the plaintiff on three grounds : (1) That they were made and accepted by each of the mortgagees with the purpose and intent of hindering, delaying and defrauding the creditors of the Genesee Iron and Brass Works ; (2) that at the time of the execution of said mortgages, the Genesee

Iron and Brass Works was insolvent and unable to pay its debts, and that said mortgagees were given in contemplation of its insolvency; and (3) so far as the mortgages to the two banks are concerned, that they were given in part for fictitious debts.

So far as the plaintiff's action is based on the first and third of these grounds, it cannot be maintained for want of proof. As bearing on the other ground upon which it is claimed that plaintiff may recover, viz., that the transfers in question were made in contemplation of insolvency with intent to give preferences, the following facts are pertinent:

The Genesee Iron and Brass Works was incorporated September 28, 1888, to carry on the business of manufacturing and selling earthenware closets. Its capital stock was $50,000, and was all issued to Patrick J. Madden for patents. It would seem from the evidence, which is not very clear on this point, that Mr. Madden afterwards conveyed to the company the real estate on West avenue, where the company did its business, as a further consideration for the stock issued to him. The patents were carried on the books of the corporation at $25,100, and the real estate at $18,000. The real estate was mortgaged when the company acquired it for $9,000, which was its full value. It does not appear what the patents were worth, if indeed they were worth anything. The chattel mortgages did not specifically name them, but it seems to have been understood by the three gentlemen who purchased the personal property sold on the foreclosure of the mortgage to the Flour City Bank, that the patents were included in the property purchased at the time, and for which they paid $3,900. The mortgagee's agent who conducted the sale, swears positively that he did not sell, or pretend to sell, the patents under the mortgage, but that, on the contrary, he stated that those rights must be aquired directly from the company. It does not seem to me to be of much importance how the title to the patents was acquired. What is important is that the purchasers at the sale did acquire it, and that their bid of $3,900 was made upon the assumption that they were to acquire it. Mr. Sullivan, one of the purchasers, testified that most of the property they bought was for use in connection with the manufacture of the closets, to which the patents related, and would not be available for any other closets.

The inference is that without the patents this property would have been of very little value. The value of the patents must, therefore, be considered as less than $3,900.

It would seem that this corporation began business on a fictitious capital. As might be expected from such a beginning, the company did not prosper. No dividends were ever declared on its capital stock. The total expenses of the company for the first eight months of the year 1891 were $6,362.93, and during the same period it purchased merchandise to the amount of $3,613,05, while the total sales for the same time were only $8,641.40. On the 24th of March, 1892, the balance sheet showed the company to be in this condition :

ASSETS.

(Not including property mortgaged, nor patents.)

| | | |
|---|---:|---:|
| Open accounts due | $1,359 | 37 |
| (Of this amount $798 had been carried on the books for some time.) | | |
| Cash in Flour City Bank | | 91 |
| Cash in Commercial Bank | 9 | 62 |
| Cash in hand | 2 | 74 |
| Due from D. H. Sullivan | 15 | 57 |
| Total | $1,388 | 21 |

LIABILITES.

(Not including Munson judgment.)

| | | |
|---|---:|---:|
| Accounts payable | $4,399 | 26 |
| Accommodation paper | 10,254 | 15 |
| Other debts | 608 | 68 |
| Due P. J. Madden | 91 | 90 |
| | $15,353 | 99 |

On the 24th of March, 1892, the plaintiff recovered a verdict against the Genesee Iron and Brass Works in an action for damages for personal injuries, tried at the Monroe Circuit. The case had gone on the day calendar on the eighteenth of March; the trial commenced on the twenty-second or twenty-third day of March, and on the morning of the twenty-fourth, at the opening of court, the jury brought in a sealed verdict for $3,000, on which judgment for

$3,309.62 damages and costs, was docketed the same day eleven-ten o'clock A. M.

On the same morning, between nine-twenty A. M. and nine-thirty A. M., there were recorded in the Monroe county clerk's office mortgages on the corporation's West avenue real estate to Sullivan, Morris & Jerome for $600, to Joseph A. Stull for $200, to the Commercial Bank for $5,000, and to the Flour City Bank for $8,000, and at the same time there were filed chattel mortgages covering all the company's personal property to the same parties, with the exception of Stull, and for the same amounts.

These mortgages were all dated March 19, 1892, were executed by Patrick J. Madden as president, and were duly acknowledged by him the same day, before the same commissioner of deeds. They were authorized by a meeting of the board of directors, held March seventeenth, and were prepared and executed in the office of the company's attorneys, Sullivan, Morris & Jerome. Mr. Sullivan, of that firm, said at the meeting of directors that he wanted a mortgage to secure his attorney's fees in case the Munson case went against him. The meeting was not called in the regular way, and only three of the five directors attended it. At least one of the other two directors had no notice or knowledge of the meeting.

An execution issued upon the plaintiff's judgment March 25, 1892, at two-fifty-five o'clock P. M. was returned unsatisfied March 29, 1892.

The sale under the chattel mortgage given to the Flour City National Bank was held on April 2, 1892. By arrangements between themselves, all the defendants shared in the proceeds of this sale *pro rata.*

A receiver of the corporation was appointed on April 14, 1892, in an action brought by a creditor. The only money or property that ever came into his hands was a balance of ninety-one cents on deposit in the Flour City Bank to the credit of the company.

The corporate real estate was sold upon foreclosure of the first mortgage and no surplus was realized.

Upon this state of facts, it is claimed by the plaintiff that the mortgages to the various defendants were made by the corporation in contemplation of its insolvency, and so are void.

There can be very little if any doubt that the Genesee Iron and Brass Works was practically insolvent in March, 1892. Its assets

were only one-third of its liabilities, not including in the latter its capital stock.   It had been doing business at a loss for some time. So far as the proof shows, it had not refused to pay any of its obligations when due, up to March twenty-fourth.   By dint of renewals it had succeeded in keeping its paper good.   But the time was coming when the company could not meet its obligations in the ordinary course of business when due.   And in addition to its fixed obligations, there was the contingent liability of an unfavorable verdict in the Munson case hanging over the company's treasury.   This contingency evidently assumed the proportion of an expectation, for on the nineteenth of March, when that case was on the day calendar of the Circuit Court, a meeting of the directors was hastily summoned by the company's attorneys, and preparations were made to protect the attorneys and the banks against the anticipated disaster.   The mortgages were prepared and executed, and left with the attorneys on the nineteenth.   On the twenty-fourth, the day they were filed, the mortgages to both banks were handed to the attorney for the Flour City Bank, who naturally wondered that the mortgages running to the Commercial Bank should be delivered to him, and inquired the reason for it.   He was told that the directors had given instructions that the mortgages were to be delivered together and were to stand together, and if he took one he would have to take both.   Thereupon he took them both and filed them at the same time, nine-thirty A. M.   The mortgages to the attorneys had been filed ten minutes before.   Immediately upon filing the mortgages, and apparently without waiting to hear the verdict in the Munson case, the attorney for the Flour City Bank went to the works of the corporation, took possession of the property under the chattel mortgages, put a man in charge and advertised a sale for the second of April.   Reading motives in the light of events, it would seem to be plain that, irrespective of the outcome of the Munson case, the directors of the Genesee Iron and Brass Works had decided they could not go on with the business, when they authorized the mortgages.   The natural effect of filing mortgages covering all of the corporate property, real and personal, to four several creditors would be to discredit the corporation, and invite suit by the unsecured creditors.

However this may be, I think it may fairly be said, in view of all

the circumstances, the hurried meeting of the directors a few days before the case was to be tried, the remark of the company's attorney to the effect that he wanted to be secured against an adverse verdict, the holding of the mortgages for five days after they were executed, and the filing of them a few minutes before the jury rendered a sealed verdict, that the transfers were made in contemplation of the insolvency which would inevitably follow the entry of a judgment in the Munson case, and with the purpose of preferring other creditors above this plaintiff.

Having arrived at this conclusion, we have next to consider the question whether these mortgages were within the inhibition of any statute which was in effect at the time they were made, for they were undoubtedly good at common law.

Prior to 1890 the statutory restriction upon transfers by corporations was as follows : " Whenever any incorporated company shall have refused the payment of any of its notes, etc., * * * it shall not be lawful to make any transfer or assignment in contemplation of the insolvency of such company to any person or persons whatever." (Laws 1825, p. 450, chap. 325, VI ; 1 Birdseye Rev. Stat. 679, § 33.)

This statute was repealed in 1882 (Chap. 402, § 1, subd. 39), but again re-enacted in 1884 (Chap. 434) by the repeal of the Repealing Act.    It was again repealed in 1890 by the Stock Corporation Law (Chap. 564, Laws of 1890), section 48 of which is as follows : " No corporation which shall have refused to pay any of its notes. or other obligations when due, in lawful money of the United States, nor any of its officers or directors, shall assign any of its property to any of its officers, directors or stockholders, directly or indirectly, for the payment of any debt; and no officer, director or stockholder thereof shall make any transfer or assignment of *its* property, or of any stock therein, to any person in contemplation of its insolvency ; and every such transfer or assignment to such officer, director or other person, or in trust for them or for their benefit, shall be void."

This again was amended on May 18, 1892 (Chap. 688, Laws of 1892, § 48), so as to read : " No conveyance, assignment or transfer of any property of any such corporation by it or by any officer, director or stockholder thereof, nor any payment made, judgment suffered, lien created or security given by it or by any officer, director

or stockholder, when the corporation is insolvent, or its insolvency is imminent, with the intent of giving a preference to any particular creditor over other creditors of the corporation, shall be valid."

The statute which was in force at the time the transfers in question were made was the one enacted in 1890, and not repealed until May 18, 1892. It is claimed by the defendants that the statute does not affect the transfers for two reasons : *First,* because it does not prohibit transfers by the corporation itself, but only those made by an officer, director or stockholder; and, *second,* because the Genesee Iron and Brass Works had not "refused to pay any of its notes or other obligations when due, in lawful money of the United States," prior to the execution of the mortgages. In support of their construction of the statute, the learned counsel for the defendant banks contend that when an original statute, which in distinct terms forbade certain acts on the part of the corporation, and also on the part of its officers, is changed by omitting the prohibition against the acts of the corporation, leaving the prohibition against the acts of the officers in full force, and then is again amended so that once more the corporation, as well as its officers, is forbidden to do certain things, it cannot be said that the legislative intent has remained precisely the same. This would be a technical construction of a statute which, being remedial in its purpose, should be liberally construed with a view to effectuating the intention of the Legislature, which was to secure equality among the creditors of insolvent incorporations. (*Throop* v. *H. L. Co.*, 125 N. Y. 530, 533.) The statute of 1890 is substantially the same as the one for which it was substituted. (*French* v. *Andrews*, 81 Hun, 274; affd., 145 N. Y. 441.) The language of the statute is not so precise as it might be, but it can mean only one thing, viz., that a transfer of the property of a corporation, made in contemplation of its insolvency, is void. This construction of the statute has quite recently been adopted by the General Term in the second department. (*Troy Waste Mfg. Co.* v. *Harrison*, 73 Hun, 528.) Counsel for defendants concede that this is an apparent authority against them, but they contend that it is not in harmony with the decisions of the Court of Appeals in several cases wherein a distinction between the acts of officers and the acts of the corporation is indicated. They cite *Throop* v. *H. L. Co.* (125 N. Y. 530, 534); *Phillips* v. *Campbell* (43 id. 271); *Sheldon Hat Blocking Co.*

v. *Eickemeyer H. B. M. Co.* (90 id. 607); *Paulding* v. *Chrome Steel Co.* (94 id. 334).

I have examined these cases and they do not appear to me to con-.flict with the case in 73 Hun.

The contention that the word "thereof" in the statute of 1890 relates to a corporation which has "refused to pay any of its notes or other obligations when due in lawful money of the United States," would seem to be disposed of adversely to defendants by *Cole* v. *M. I. Co. et al.* (133 N. Y. 164). That case arose under the Revised Statutes, but the language is quite similar. It might be claimed with just as much force that the words "such company" in the old statute refer to a company which "shall have refused the payment of any of its debts."

The learned counsel for defendant banks, while not conceding the insolvency, present or imminent, of the Genesee Iron and Brass Works, contend with much earnestness and equal ingenuity, that even if the company was insolvent, or contemplating insolvency at the time these mortgages were given, there is no proof that the mortgages were given in contemplation of that insolvency, but that, on the contrary, the evidence requires the finding that they were demanded by the banks and given by the corporation in the ordinary course of business, and so are within the principle of *Paulding* v. *Chrome Steel Co.* (94 N. Y. 339) and kindred cases. The evidence which it is claimed supports this contention is the testimony of Mr. Hathaway, the president at that time of the Flour City Bank, and of Mr. Pond, who was then cashier of the Commercial Bank.

Mr. Hathaway testified that on the 15th or 16th of March, 1892, Mr. Madden, president of the iron and brass works, came in and stated that they needed more money badly, and would secure the bank by a mortgage on their real estate on West avenue, and also, if required, on their personal property. The amount Madden mentioned was a few hundred dollars. Hathaway told him they could have the money upon giving that security, and the following day .Madden brought in two notes which Hathaway marked for discount to the credit of the company. These notes were dated March 17, 1892, and were made, one by Mary Egan, for $350 and interest, and the other by W. A. Granger, for $422.63 and interest, payable in three months to the order of the Genesee Iron and Brass Works.

On or about March twenty-first, Madden brought in two more notes, dated that day, one made by Peter F. Keefe, for $300, and the other by Patrick J. Madden, the company's president, for $200, payable in three months with interest. Before discounting them, Mr. Hathaway inquired of the bank's attorney whether the mortgages had been delivered and filed, and upon being assured that they were made and ready for delivery and would be filed, he marked the notes for discount and the proceeds were placed to the company's credit. Upon cross-examination Mr. Hathaway stated that these four notes were all new paper, and were marked for new discount. In this he seems to have been mistaken, for the books of the bank, which were afterwards introduced, show quite unmistakably that all but the Madden note were renewals of notes of the same makers which had been in the bank for some time. Mr. Hathaway admitted that he did not consider the account of the Genesee Iron and Brass Works a profitable one at that time; that he knew of the Munson suit which was pending, and that he knew the giving and recording of the chattel mortgage would tend to discredit the company.

Mr. Pond, of the Commercial Bank, testified in substance that Mr. Madden came to his bank and wanted a little additional loan, and it was agreed that his company should give a chattel mortgage which should cover its indebtedness to both banks. It is conceded that no additional loan was made to the company by the Commercial Bank after this arrangement. This testimony is corroborated so far as the transactions were within his knowledge, by the attorney for the Flour City Bank, and it must be considered as proved that an arrangement was made between the two banks and the company by which the latter agreed to give mortgages on all its property, real and personal, to secure its indebtedness to the former, and in consideration of which the Flour City Bank discounted a new note for $200. This, however, it seems to me, is far from saying that the transaction was an ordinary business transaction, without any thought in the mind of either party of the company's impending disaster. It may very well be that the officers of the two banks were not aware of the company's bankrupt condition nor of the disastrous effects of an unfavorable verdict in the Munson case. The statute, however, does not make the question depend upon the knowledge

or intent of the creditor, but " upon what was passing in the minds of the officers of the company when the mortgage was executed." (*Paulding* v. *Chrome Steel Co.*, 94 N. Y. 341.) It will hardly be claimed that Mr. Madden, when he made the arrangement by which these securities were given, and an additional loan of $200 obtained, was ignorant of the embarrassed condition of his company, nor that he failed to appreciate that certain disaster would follow upon the heels of a verdict for any considerable amount in the Munson case. If Mr. Madden and the other officers of the corporation, notwithstanding the pressure of great embarrassments, had entertained an honest expectation, in the exercise of a reasonable intelligence, of going on with the business and paying the debts, and to that end had borrowed of the defendant banks the necessary money, upon the security of the mortgages, their acts could not be brought within the operation of the statute. Even if the securities had been created for the purpose of raising money in order to distribute it by *preferential payments* among the creditors, it would be the payments and not the securities on which the money was raised which the statute would avoid. (*Curtis* v. *Leavitt*, 15 N. Y. 113.) There is here, however, no such situation. At most, only $200 was advanced upon the mortgages, which, on their face, purport to be securities for an *indebtedness* " due and to become due," and not for future advances. None of the authorities to which I have been referred has gone the length of holding that a mortgage given mainly as security for a pre-existing indebtedness will be made valid because a small part of the consideration was a new loan. Were it not for the maxim " void in part, void *in toto*," it might be possible to hold that the mortgage to the Flour City Bank was valid to the extent of the money actually advanced upon it.

It is also urged by the defendants that the facts of this case bring it within the rule which was thus stated by Judge DANFORTH in *Paulding* v. *Chrome Steel Co.* (*supra*) : " If they (the officers of the corporation) acted in pursuance of a previous contract, by which the company was bound, either in law or equity, or otherwise, under such circumstances that it could not have a choice, the condition of insolvency became of no moment, for it was not in contemplation, or in their minds. The intention in such a case must be referred to

an actual obligation which the debtor was bound to fulfill." That language was used with reference to a chattel mortgage which was given wholly for money advanced, and some five years after the loan was made, in fulfillment of an agreement made at the time, to give such security. I do not understand that this doctrine has any application to a case where the agreement to give security is made after the corporation has become insolvent, or when it is expected it will shortly become so.

There remains one other question to be considered: Is the plaintiff a creditor who can maintain this action? The learned counsel for the Flour City Bank maintains that she is not, and quotes from the opinion in *Esmond* v. *Bullard* (16 Hun, 65), which was an action against trustees of a corporation in default of an annual report, as follows: "The whole object of the statute (Laws 1848, ch. 40, sec. 12) is to protect persons voluntarily dealing with the corporation and trusting its credit, not to protect those injured by mere tort." The statute referred to provided that the trustees of a corporation, in certain cases, "shall be liable jointly and severally for all the debts of the company then existing and for all that shall be contracted," etc.; and it was held that a liability for a tort is not a *debt* under a statute which is to be construed strictly; it is not contracted, for it does not grow out of contract. The object of that statute, and of all statutes which impose a liability upon directors for the payment of claims of creditors, is said to be partly to induce the directors to do their prescribed duties and partly to secure the company's creditors from losses caused by the acts of those who have control over the company's fortunes. (Morawetz Priv. Corp. § 908.)

The object of the statute prohibiting preferences by insolvent corporations is, as we have seen, to secure an equal distribution of the assets among all the creditors. Creditors of such corporations are not discouraged by the courts from obtaining such preferences as they may by diligence; the officers of the corporation may not, however, actively aid a creditor to secure payment before the others. The law declares all transfers made with that purpose utterly void — not void as against contract creditors only, but, I take it, as against any person who would be entitled to share ratably in the assets of the corporation, as they would be distributed by a receiver.

It has been uniformly held that the protection of the Statute of

Frauds extends to persons whose claims arise from torts. (Wait Fraud. Conv. § 90.) Judge DANIELS said, in *Martin* v. *Walker* (12 Hun, 46, 51): " Conveyances made to defraud a party entitled to claim satisfaction for a liability arising out of the commission of a tort, can have no greater validity in law or equity than they would have if made to defeat the payment of an unquestioned and acknowledged indebtedness. All obligations are alike to be protected against the fraudulent disposition of the property of the party liable to satisfy them. The intent which will vitiate them in the one case, must be equally as fatal to them in the other." The statute we have been considering was designed to prevent frauds on creditors. (*Troy Waste Mfg. Co.* v. *Harrison*, 73 Hun, 528, 532.) If it be said that the person recovering judgment on a tort, after the transfer, is a subsequent creditor, and that, therefore, actual fraud must be established to set aside the conveyance as to him (*Fuller* v. *Brown*, 76 Hun, 559), the answer will be that this conveyance was made with the intention of preventing the plaintiff from collecting her anticipated judgment, and so was an actual fraud on her.

The question is apparently a new one in the courts of this State, and with no authority constraining me, I am not inclined to hold that a corporation may dispose of its property so as to defeat the claims of those who have been injured by its tortious acts, though it may not do so as to defeat the claims of its contract creditors. I prefer rather to follow the Supreme Court of Rhode Island which, in an action precisely like this, said : " As trustees for creditors, we think the directors were as much bound to care for those who had given them notice of their claims by suits in case they should succeed in obtaining judgment as for those whose claims had been already ascertained. Their action was taken with full knowledge that these claims might ripen into judgments entitled to payment from the property of the company. We fail to see that it was any less the duty of the directors to protect these liabilities of the company than those arising upon contracts which the holders were not prosecuting to judgment." (*Olney* v. *Conanicut Land Co.*, 5 L. R. A. 361.)

It follows that plaintiff is entitled to judgment declaring the mortgages void.

Judgment affirmed, with costs, on the opinion of WARD, J., and of the referee.